UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| EX REL. TIMOTHY J. GOULDEN, | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | C.A. #11-CA-12017 NMG |
| BAE SYSTEMS INFORMATION AND ELECTRONIC | ) | |
| SYSTEMS INTEGRATION, INC., and BAE SYSTEMS, INC. | ) | |
| Defendants. | ) | |

## VERIFIED FIRST AMENDED *QUI TAM* COMPLAINT

### (I)   INTRODUCTORY STATEMENT

(1)     The Plaintiff-Relator Timothy J. Goulden brings this action on behalf of the United States of America (hereinafter the "Government") under the *Qui Tam* provisions of the False Claims Act 31 U.S.C. § 3729 et seq. ("FCA") alleging that the Defendants BAE Systems Information and Electronic Systems Integration, Inc. (hereinafter "BAE") and BAE Systems, Inc. (hereinafter "BAE Systems, Inc.") has violated these laws by knowingly and intentionally submitting false records and false statements as well as false claims for payment to the Government relating to contracts with the United States Military approximating $1 Billion concerning the production and testing of Thermal Weapon Sights in which contract specifications mandated that such Thermal Weapon Sights be tested in live fire weapons testing. It is alleged herein that the Defendants BAE and BAE Systems, Inc. knowingly and intentionally failed to conform to the contractual testing requirements relating to the Thermal Weapon Sights by utilizing machine guns illegally possessed and manufactured by BAE and BAE Systems, Inc. in direct violation of strict and explicit federal law and related Bureau of Alcohol, Tobacco and Firearms and Explosives (hereinafter "ATF") regulations.

(2)     The Defendants BAE and BAE Systems, Inc. knowingly provided false statements, false records and false certifications to the Government along with false claims for payment relating to the production and testing of the Thermal Weapon Sights. The Government relied upon the statements, records and certifications by BAE and BAE Systems, Inc. to the Government relating to the production and testing of the Thermal Weapon Sights and paid claims submitted for payment from BAE and BAE Systems, Inc.

(3)     As a result of these submissions of false statements, false records and false certifications and as a result of the submission of false claims for payment by BAE and BAE Systems, Inc. to the Government, of which were paid by the Government, the Government has incurred and continues to incur significant financial losses and damages.

(4)     Further, the Plaintiff-Relator Timothy J. Goulden alleges that BAE violated the anti-retaliation provision of the FCA, 31 U.S.C. § 3730(h) when the Plaintiff-Relator Timothy J. Goulden was terminated from his employment when he brought to the attention of his employer, BAE that the utilization of machine guns illegally manufactured and possessed by BAE and BAE Systems, Inc. to meet the contractual testing requirements of the Thermal Weapon Sights was in violation of federal law and related ATF regulations.

(5)     *Qui Tam* Plaintiff Timothy J. Goulden seeks through this action to recover damages and civil penalties from the Defendants BAE and BAE Systems, Inc. arising from the submission of false statements, false records and false certifications and the submission of false claims for payment to the Government. The Plaintiff-Relator also seeks compensation, damages and attorney's fees for wrongful termination and wrongful retaliatory termination as provided under 31 U.S.C. § 3730(h) of the FCA and under other relevant federal and state statutes and under common law.

(II)    JURISDICTION AND VENUE

(6)    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 3732 which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. § 3729 and § 3730.

(7)    This Court has jurisdiction over the Defendants BAE and BAE Systems, Inc. pursuant to 31 U.S.C. § 3732(a) which provides that "any action under Section 3730 may be brought in any judicial district in which the defendant or in the case of multiple defendants, any one defendant can be found, resides, transacts business or in which any act proscribed by Section 3729 occurred." Section 3732(a) also authorizes nationwide service of process. The Defendants BAE and BAE Systems, Inc. during all times relevant to this Complaint, transact business within the District of Massachusetts.

(8)    Venue is appropriate in this district pursuant to 31 U.S.C. § 3732(a) because the Defendants BAE and BAE Systems, Inc. can be found, reside in, and/or transact business in the District of Massachusetts and because some of the violations of 31 U.S.C. § 3729 described herein occurred within this judicial district.

(III)    PARTIES

(9)    The Plaintiff-Relator Timothy J. Goulden is a citizen of the United States who has a principal place of residence in Amherst, New Hampshire. Mr. Goulden was employed by the Defendant BAE from November 2008 to July 21, 2011 working as Operations Manager of BAE's Group C Thermal Weapon Sight Firing Range Services and Support Group (hereinafter "FRS & S Group") which was conducting live weapons fire testing for Thermal Weapon Sights manufactured by BAE and supplied to the United States Army pursuant to a Thermal Weapon

Sights contract by and between BAE and the United States Army. The Plaintiff-Relator Timothy J. Goulden is the original source of the facts and information concerning the fraudulent acts and practices of the Defendants BAE and BAE Systems, Inc. He has direct and independent knowledge of the information upon which the allegations are based and has voluntarily provided the information to the United States before filing an action based upon such information. The Plaintiff-Relator Timothy J. Goulden has provided an appropriate mandatory "Disclosure Statement" to the Government as required by law.

(10)   The Defendant BAE is a corporation duly-organized under the laws of the State of Delaware with a principal place of business at 2 Forbes Road, Lexington, Middlesex County, Massachusetts. Its Registered Agent for Service is CT Corporation System, 155 Federal Street, Suite 700, Boston, Massachusetts 02110.

(11)   The Defendant BAE Systems, Inc. is the United States based subsidiary of BAE Systems PLC and is a corporation duly-organized under the laws of the State of Delaware with a principal place of business at 1101 Wilson Boulevard, Arlington, Virginia. Its Registered Agent for service is the Corporation Trust Company, Corporate Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

(12)   The Defendant BAE is a subsidiary of BAE Systems, Inc. which is itself a subsidiary of BAE Systems PLC which is a foreign-owned United Kingdom company which operates through a Special Security Agreement between the United States Government and BAE Systems, Inc. Its principal place of business is: Stirling Square, 6 Carlton Gardens, London, SWIY 5AD, United Kingdom. BAE Systems PLC is a foreign defense contractor with numerous contracts with the United States Military and United States Department of Defense. It has a significant history of fraud, deceit and corruption involving United States Military contracts. In 2010, BAE Systems PLC pleaded guilty to conspiracy relating to its knowing failure to ensure

compliance with legal prohibitions in foreign bribery.  BAE Systems PLC *was fined $400 Million—among the largest fines in the United States Justice Department's efforts to combat overseas corruption in international business.*

Recently in May of 2011, BAE Systems PLC agreed to pay a *$79 Million civil penalty— the largest civil penalty at the time in U.S. State Department history for failure to cooperate with an investigation into thousands of alleged violations of U.S. rules for military exports.*

(IV)  <u>BAE'S INTENTIONAL AND KNOWING FAILURE TO TEST MANUFACTURED THERMAL WEAPON SIGHTS IN CONFORMANCE WITH CONTRACTUAL TESTING REQUIREMENTS AND IN CONFORMANCE WITH FEDERAL LAW AND FEDERAL REGULATIONS</u>

(A)  **Relevant Background**

(1)  Pursuant to the ongoing conflict and combat in Iraq and Afghanistan, the U.S. Military was in need of Thermal Weapon Sights to be affixed to *military standard and military-spec machine guns* being used by U.S. Military soldiers in warfare—i.e. the war fighter.[1]

(2)  A Thermal Weapon Sight is a versatile man-portable infra-red imaging sensor which gives soldiers a tremendous day/night advantage to detect, observe and engage the enemy in the battlefield by providing imagery independent of darkness, smoke and other common battlefield obscurants.

(3)  Pursuant to same, the U.S. Military and specifically, the U.S. Army not only required the Thermal Weapon Sight product but also required that the Thermal Weapon Sight product be tested upon *military standard and military-spec machine guns* to provide assurances and confidence to the U.S. Military that the Thermal Weapon Sights would operate and

---

[1] The military standard and military-spec weapons included M16, M4 weapons and variants, M240 and M2HB machine guns.

function appropriately when used in conjunction with military standard and military-spec machine guns by U.S. soldiers in combat.

(4)     In or about 2003, BAE entered into its initial military contract with the United States Army for the production of Thermal Weapon Sights. Subsequently, in July of 2007, BAE entered into Contract #W91CRB-07-D-003 for the production and manufacture of the 28 Micron Thermal Weapon Sights and next iteration of Thermal Weapon Sights (i.e. 17 Micron).

(5)     The July 2007 contract award totalled approximately $183 Million Dollars as part of a $2,191,036,915.50 firm "fixed-price contract" with BAE for the production, manufacture and testing of Thermal Weapon Sights.

(6)     Subsequently in April of 2011, BAE entered into a $56 Million contract with the U.S. Army for the production, manufacture and testing of Thermal Weapon Sights.[2] With the inclusion of the $56 Million contract, BAE will have billed the U.S. Army and the U.S. Government more than $1 Billion since 2004 under U.S. Military contracts requiring the production, manufacture *and testing of* the Thermal Weapon Sights.

(7)     The initial 2003 military contract by and between the United States Army and BAE included exact and detailed specifications and requirements mandating that the Thermal Weapon Sights manufactured by BAE were to be tested in live fire weapons testing utilizing *military standard and military-spec machine guns* being used by the U.S. soldier in combat.

---

[2] The average cost per unit of a Thermal Weapon Sight billed by BAE to the Government is Nine Thousand ($9,000.00) Dollars.

(8)     The U.S. Military mandated that the live fire portion of the testing be conducted with the use of the identified military standard and mil-spec machine guns used by the U.S. soldier in combat because the entire purpose of the contract for the production and purchase of the Thermal Weapon Sights was for the provision of these Thermal Weapon Sights to the U.S. soldier in combat *using military standard and mil-spec machine guns.* Thus, the U.S. Military bargained for and contracted for, not only the purchase of the Thermal Weapon Sights but for the appropriate testing of the Thermal Weapon Sights which would provide assurance and confidence that these Thermal Weapon Sights would operate and function properly for the use of the U.S. soldier in combat conditions *when mounted upon military standard and mil-spec machine guns.*

(9)     There are three variants of the Thermal Weapon Sights—i.e. TWS II—light, medium and heavy which are designed around BAE's Micro IR microbolometer-based sensor architecture.   These Thermal Weapon Sights were in development and qualified in partnership with Program Executive Office-Soldier (PEO Soldier) at Fort Belvoir, VA to provide Army Infantry and U.S. Marine Corps with the ability to detect and engage targets day or night in all weather and battlefield obscurant conditions.

(10)    The majority of the Thermal Weapon Sights were manufactured in BAE's Lexington, Massachusetts facility and underwent live weapon fire testing in Merrimack, New Hampshire and then in Epping, New Hampshire by the Firing Range Services and Support Group for Group C Thermal Weapon Sight live fire, the group managed and supervised by the Plaintiff-Relator Timothy J. Goulden.

(11)    The Thermal Weapon Sights were subjected to "Lot Testing" consisting of nine (9) Thermal Weapon Sights three (3) heavy; three (3) medium; and three (3) light for each lot.  The subject Thermal Weapon Sights were hand-delivered *on a daily basis* from

7

BAE's facility in Lexington, Massachusetts where they *were manufactured.* They were delivered on a daily basis to Mr. Goulden and his "FRS & S Group" where they underwent live weapons fire operation. *At the end of each day's* live weapon's fire testing, the subject Thermal Weapon Sights were retrieved by BAE personnel and returned to the Lexington, Massachusetts facility.

(12)   As demonstrated by BAE's own documents, the company knew and was aware that contract requirements required and mandated that the Thermal Weapon Sights be subjected to live weapons fire during product quality testing utilizing *military standard and mil-spec machine guns* actually used by U.S. soldiers in combat to simulate battlefield conditions.   Reference is made to Exhibit #1, page 3 of an October 23, 2008 PowerPoint Presentation by Paul Kling, Vice President, Operations of BAE entitled "*Why is Shooting Important*" of the overall presentation entitled "**Firing Range Operations Status**" which states in part:

> "Section 3.3.6.9.2 [of the Contract] details the **weapon configuration** and round counts for weapons fire testing." (Emphasis added.)

And notes:

> "**3.3.6.9.2 [of the Contract].** "**Weapon firing shock.**" **Each type of TWS [Thermal Weapon Sights], while operating, shall not exhibit damage, degradation of performance, or loss of boresight when subjected to weapon firing for that type of TWS, as identified in table 3.3.6.9.21.**" (Emphasis added.)

Finally, the PowerPoint Presentation explicitly notes on page 3:

> "**Weapons firing is the best check on how the system is working in the *soldier's hands*.**" (Emphasis added.)

Further, reference is made to Exhibit #2, a memorandum dated May 22, 2009 and prepared by Kenneth Gatto, Manager of the "Firing Range Services & Support Group" relative to BAE's lobbying efforts to pass Bills S.941 and H.R. 2296 relaxing existing gun control law which specifically limits and restricts the entities that can manufacture and possess machine guns in the United States.  Mr. Gatto states in part:

> "Contract requirements [for the production Thermal Weapon Sights] require the Thermal Weapon Sights be subjected to live weapons fire during product quality testing in order to simulate battlefield conditions which the Thermal Weapon Sites [sic] may experience. **The firearms specified by contract are mil-spec machine guns**." (Emphasis added.)

(13)   A United States defense standard often called military standard "Mil-STD", Mil-Spec" or informally, "Mil Specs" is used to achieve standardization objectives by the U.S. Department of Defense.   Standardization is beneficial in achieving interoperability, ensuring products meet certain requirements, commonality, reliability, total cost of ownership, compatibility with logistics systems and similar defense-related objectives. MIL-STD 961 covers the content and format for defense specifications.

(14)   As noted herein, BAE's 2003 contract with the U.S. Army including Contract #W91CRB-07-D003 included exact and detailed specifications which mandated that the manufactured Thermal Weapon Sights be tested upon certain and specific *identified military standard and mil-spec machine guns*.

(15)   Subsequent to the award by the Government to BAE of the 2003 Thermal Weapon Sights contract, BAE requested from the Government, an "adjustment" or modification to the contract specifications concerning the mandate that the manufactured Thermal Weapon Sights be tested upon specific *identified military standard and mil-spec machine guns*.

(16)    In response to BAE's request, the Government issued an internal work specification document noting that BAE would be allowed to test the subject Thermal Weapon Sights utilizing an "equivalent" to *military standard and mil-spec machine guns.*[3]

**(B)    BAE's Unlawful Possession, Manufacture and Repair of Machine Guns Utilized by BAE in a Fraudulent Attempt to Meet Contractual Testing Specifications and Requirements**

(18)    At or around the time the Government awarded BAE the initial Thermal Weapons Sight contract in 2003 concerning the manufacture and testing of the Thermal Weapon Sights, BAE fraudulently obtained through the efforts of Mr. Goulden's predecessor, David Buchanan, a Type 10 and Type 11 weapons manufacture license.

(19)    (a)     A Type 10 license authorizes the manufacture of Title 1 firearms, ammunition and ammunition components, ammunition for Destructive Devices and Armor Piercing ammunition (can act as a dealer); and

         (b)     A Type 11 license authorizes the importation of Title 1 firearms, ammunition and NFA Destructive Devices, ammunition for Destructive Devices and Armor Piercing ammunition.

(20)    Pursuant to 27 CFR 478.11, a manufacturer is "Any person [or entity] engaged in the business of manufacturing firearms or ammunition. The term shall include any person [or entity] who engages in such business on a part-time basis." At no time including 2003 to date has BAE ever been in the "business of manufacturing firearms or ammunition". Thus, BAE is not and has never been a licensed manufacturer of weapons and firearms.

---

[3] It is unclear as to whether the required steps and procedures were followed and whether the required written authorizations were obtained, necessary for the grant of a "waiver" from the testing specifications detailed in the contract mandating the use of *military standard and mil-spec machine guns* for live fire testing to the use of an "equivalent" to *military standard and mil-spec machine guns.*

(21)    Initially, in or about 2003 or 2004, utilizing their fraudulently obtained Type 10 license,

BAE purchased from duly-qualified Government contractors for the testing of the

manufactured Thermal Weapon Sights, military standard and mil-spec weapons including

six (6) M16/M4 rifles from Colt and two M240 machine guns from FN Herstal by falsely

representing to these two companies that they were purchasing the weapons for the **sole**

**purpose** of presenting weapons demonstrations to law enforcement agencies.[4]

(22)    Even if BAE was a qualified NFA manufacturer with a valid Type 10 license, which it

was not, BAE could only contract with Colt and FN Herstal for the production and

purchase of machine guns if the machine guns were "solely for sale to the U.S. or state

governmental entities for distribution as 'sales samples' for exportation". (See Sections

7.5.1, 7.5.2, 7.5.3 and 7.6.1 of the ATF National Firearms Act Handbook.) (See also 18

U.S.C. § 922(o).) Section 7.5.3 of the ATF National Firearms Act Handbook states

specifically:

> "7.5.3 **May machine guns be manufactured for distribution to U.S.**
> **Government contractors?** As interpreted by ATF, Section [18 U.S.C.]
> Section 922(o) contains no exception that would permit the lawful
> manufacture and stockpiling of machine guns for transfer to Government
> contractors. **The only exceptions to the machine gun transfer and**
> **possession prohibitive in the statute are for machine guns**
> **manufactured for sale to federal and state agencies, for distribution**
> **and use as sales samples, or for exportation.**" (Emphasis added)

(23)    Further, under federal regulations, the manufacture and purchase of machine guns **solely**

for testing and research purposes is not recognized as a legitimate exception to the ban on

the possession or transfer of firearms under 18 U.S.C. § 922(o). (See Section 7.6.2 of the

ATF National Firearms Act Handbook.)

---

[4] Only certain manufacturers and military contractors are licensed to or capable of manufacturing the military
standard and mil-spec weapons detailed in the Thermal Weapons Sight Contract #W91 CRB-07-D003: (a) The
M16 is produced for the U.S. Military by Colt Defense, Daewoo, FN Herstal, H&R Firearms, General Motors
Hydramatic Division; (b) The M240 machine gun is produced by FN Herstal; (c) The M2HB heavy machine gun is
produced by General Dynamics, Fabrique Nationale, U.S. Ordnance and Man Roy Engineering.

C:\WPDOCS\A FALSE CLAIMS\GOULD\PLEADINGS\0121112\STD\1ST AMND QUI TAM COMPLAINT GOULD.DV.doc

(24)   BAE knowingly and intentionally and in violation of clear federal law and regulations, purchased the subject military standard and mil-spec weapons from Colt Defense and FN Herstal with the *sole intent* of utilizing them to meet the testing specification requirements relating to the Thermal Weapon Sights under the contract.

(25)   BAE utilized these military standard and mil-spec machine guns in extensive live weapons firing to meet contractual testing requirements relating to the Thermal Weapon Sights. Consequently, these military standard and mil-spec machine guns became worn and degraded with the excessive use.

(26)   BAE then unlawfully attempted on its own without coordination of the original manufacturer of the military standard and mil-spec machine guns to refurbish and rebuild the machine guns *several times* for continued weapons firing testing relating to the Thermal Weapon Sights.

(27)   When the military standard and mil-spec M4/M16 weapons manufactured by Colt Defense became worn and were sent to Colt for refurbishment, Colt destroyed the weapons.   The originally purchased M240's from FN Herstal were unlawfully refurbished by a commercial company, Ohio Ordnance Works (OOW).[5]

(28)   Subsequent to the 2003 contract with the Government for the production and testing of Thermal Weapon Sights, BAE: a) entered into a 2007 contract with the Government for the production and manufacture and *testing* of the 28 Micron Thermal Weapon Sight and the next iteration—i.e. 17 Micron; b) entered into a $56 Million contract with the Government in 2011 for the production, manufacture and *testing* of thermal weapon

---

[5] The repair and refurbishment was unlawful because the M240's were to be utilized for the sole purpose of meeting contractual testing requirements—in clear violation of federal law and NFA regulations.

sights resulting in approximately 100,000 Thermal Weapon Sights manufactured *and tested* by BAE for the Government.

(29)     Federal law allowed BAE to legally obtain *military standard and mil-spec machine guns* directly from the Government as "Government Furnished Equipment". (See 18 U.S.C. § 922(o).)  These legally obtained military standard and mil-spec machine guns could legally have been utilized by BAE to meet the contractual testing requirements relating to the Thermal Weapon Sights.

(30)     However, eager to profit from substantial lucrative military contracts with the Government relating to the Thermal Weapon Sight production but concerned with the complexities and the "significant additional costs"[6] associated with efforts to lawfully obtain *military standard and military-spec machine guns* from the Government for the testing of the Thermal Weapon Sights, BAE requested from the Government, an "adjustment" or "modification" of the Thermal Weapon Sights contractual testing specifications to an "equivalent" to the contractually specified *military standard and mil-spec machine guns.*[7]

## (C)     BAE'S "Assisted Manufacture" Scheme

(31)     In or about 2007 or 2008, BAE developed a scheme that if it "manufactured" the machine guns under their illegally-obtained Type 10 license, BAE would be in legal possession of machine guns under 18 U.S.C. § 922(o).  Reference is made to an excerpt of a

---

[6] Reference is made to the Memorandum dated May 22, 2009 and prepared by Kenneth Gatto, BAE's Manager of the "Firing Range Services & Support Group" attached hereto as Exhibit #2.
[7] Notwithstanding whether the machine guns were "equivalent" to "military standard and mil-spec" machine guns under federal law such machine guns could not be transferred to, possessed by or manufactured by BAE as a Government contractor for the use in testing, research, design or other work in fulfilling Government contracts. (See 18 U.S.C. § 922(o) and see Section 7.6.2 of the ATF National Firearms Act Handbook.)  (See Sections 7.5.1, 7.5.2, 7.5.3 and 7.6.1 of the ATF National Firearms Act Handbook.)

memorandum of Kenneth Gatto, BAE's Manager of Firing Range Services & Support

Group dated May 22, 2009 providing *BAE's interpretation* of 18 U.S.C. § 922(o):

> "Under current law, U.S. companies cannot legally obtain modern
> machine guns (e.g. post-1986) for test purposes needed to fulfill
> government contracts unless the machine guns are **manufactured by the
> company,** provided to the company by the government, or obtained as
> part of a law enforcement or government demonstration."[8]  (Emphasis
> added.)

- See <u>Exhibit #2</u>.

(32)   BAE's fabricated "manufactured by the company" exception is not consistent with or in

accord with 18 U.S.C. § 922(o) which states in part:

> ". . . 'it shall be unlawful for any person to transfer or possess a machine
> gun' except as to a machine gun '. . . transfer[ed] to or by, or possession
> by or under authority of the United States or any department, agency or
> political subdivision thereof'."

(33)   Further, BAE's said fabricated "manufactured by the company" exception is not

consistent with or in accord with Section 7.6.2 of the ATF National Firearms Act

Handbook" **Manufacture of Machine Guns Solely for the Purpose of Testing"** which

states:

> "The manufacture of machine guns solely for testing or research purposes
> **is not recognized as a legitimate exception** to the ban on possession or
> transfer of firearms under 18 U.S.C. § 922(o).  As previously stated,
> manufacturers may only manufacture machine guns on or after May 19,
> 1986 and stockpile same if they **are manufactured and held for sale to
> federal or state agencies for distribution as 'sales samples' or for
> exportation."** (Emphasis added.)

(34)   Also, reference is made to 27 CFR 479.105 entitled "Transfer and Possession of Machine

Guns".  This regulation references 18 U.S.C. § 922(o) which mandates that it is unlawful

for any person or entity to manufacture, possess or transfer a machine gun with specific

---

[8] As noted hereinabove, BAE used the false pretense and false representation of a "law enforcement on government demonstration" to initially obtain weapons from Colt and FN Herstal to test the Thermal Weapon Sights—a clear violation of 18 U.S.C. § 922(o).

exceptions.   None of the stated exceptions included within 27 CR 479.105 apply to BAE's scheme to "manufacture" machine guns for the *sole purpose* to meet contractual testing requirements relating to the Thermal Weapon Sights.[9]

(35)   As BAE was not in fact, a properly-licensed firearms manufacturer and as BAE did not have the ability, know-how or the facilities to "manufacture" machine guns that might be construed as the "equivalent" of military standard and military-spec machine guns needed to conduct live weapons fire testing for the Thermal Weapon Sights, BAE engaged in an illegal "assisted manufacturing" scheme with Ohio Ordnance Works to "manufacture" such machine guns.

(36)   The legal definition of a "machine gun" is found at 26 U.S.C. § 5845(b) which states:

> "**Machinegun.** The term 'machinegun' means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. **The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.**" (Emphasis added.)

(37)   As part of its "assisted manufacture" scheme, BAE used its illegally obtained Title 10 license to purchase the restricted part of the NFA weapon—i.e. the sideplate of the receiver for the M240 and M2HB machine guns and subsequently the BAE armorer would then place temporary rivets into the receiver and the machine gun would then be sent to the commercial firearms manufacturer, Ohio Ordnance Works under the pretense of the need for "repair".

---

[9] In regard to 27 CFR 479.105(e) there is no evidence that the machine guns "manufactured" by BAE were "particularly suitable for use by federal, state or local governmental entities and that the making of the weapon— [was] at the request and on behalf of such an entity". BAE clearly "manufactured" the subject machine guns in violation of federal law for the sole purpose of meeting the contractual requirement relating to the Thermal Weapon Sights.

(38)   Upon receipt of the sideplates, Ohio Ordnance Works then "manufactured" M240 and M2HB machine guns for BAE which were then used for the **exclusive purpose of testing the Thermal Weapon Sights**. Reference is made to Section 7.6.1 of the ATF National Firearms Handbook which states in part:

> "**7.6.1 Contractors' manufacture of machine guns.** As previously stated, machine guns manufactured in the U.S. on or after May 19, 1986 must be solely for sale to U.S. or state governmental entities, for distribution as "sales samples" or for exportation. (See Sections 7.5.1 and 7.5.2.) However, **a qualified NFA manufacturer** may contract with other qualified firms to produce machine guns it **intends to distribute only for those purposes**." [10] (Emphasis added.)

(39)   Further, BAE "manufactured" M16/M4 rifles *used exclusively for the purposes of testing the Thermal Weapon Sights* by purchasing semi-automatic lower receivers (AR-15) and then converting the semi-automatic lower receiver into a fully-automatic lower receiver. This work was performed by BAE employees who had neither the skill nor training to "manufacture" machine guns that were the "equivalent" of military standard and military-spec weapons detailed in the subject military contracts.[11]

(40)   BAE's herein detailed "assisted manufacturing" scheme was unlawful and in clear violation of 18 U.S.C. § 922(o) and related ATF National Firearms Act Handbook regulations referenced herein.

(41)   In a fraudulent attempt to minimize its costs to meet contractual testing specifications and requirements relating to the Thermal Weapon Sights, BAE used illegally manufactured machine guns which were unlawfully in their possession to test Thermal

---

[10] As noted herein, BAE was not a proper and legal "NFA manufacturer".

[11] Section 7.5.4 of the ATF National Firearms Act Handbook states that 18 U.S.C. § 922(o) makes it unlawful to possess or transfer any machine gun **including a machine gun frame or receiver**, manufactured after May 18, 1986 with the only exception being: weapons produced by a **qualified manufacturer for sale to government entities**, as sales samples or for exportation. (Emphasis added.)

Weapon Sights under Government contracts with BAE including but not limited to:  a) an initial military contract in or about 2003; b) a 2007 contract, Contract #91 CRB-07-D-003, with the Government for the production and manufacture and testing of 28 Micron Thermal Weapon Sights and the next iteration—i.e. 17 Micron; c) a $56 Million contract with the Government in 2011 for the production, manufacture and testing of Thermal Weapon Sights resulting in approximately 100,000 Thermal Weapon Sights manufactured and tested by BAE for the Government.

(D)     **Thermal Weapon Sight Contracts By and Between the Government and BAE were "Fixed-Price" Contracts**

(42)    The Thermal Weapon Sight contracts by and between the U.S. Government and BAE were "fixed-price" contracts.  Such "fixed-price" contracts obligated BAE to deliver to the Government *at a pre-determined fixed-price* the Thermal Weapon Sights which were mandated by contract to be production-tested with live fire weapons testing *with the use of military standard and mil-spec weapons or "equivalent"*.  Thus, under these "fixed-price" contracts, the production and the testing cost burden to produce and the delivery of the Thermal Weapon Sights at or under the "fixed-price" was placed directly upon BAE.  Consequently, the lower that BAE could reduce its production and testing costs, the higher and more substantial profits it would receive.

(43)    In an obvious knowing and intentional attempt to avoid "significant additional costs"[12] associated with the use of military standard and mil-spec machine guns to test the Thermal Weapon Sights and in an obvious knowing and intentional effort to increase its profits, BAE:  a) requested that the Government "adjust" or "modify" the testing specifications requiring BAE to *utilize military standard and mil-spec weapons* to test

---

[12] See Exhibit #2, Memorandum of Kenneth Gatto dated May 22, 2009.

the Thermal Weapon Sights to utilizing an "equivalent" to military standard and mil-spec machine guns; b) then defrauded the Government by unlawfully possessing and illegally manufacturing machine guns in violation of federal law and federal regulations in a fraudulent attempt to meet contractual testing requirements.

(44)   As detailed hereinbelow in Section VI, Relevant Chronology ¶ 60-92, BAE was well-aware of and had knowledge of the strict federal laws limiting the possession and manufacture of machine guns as detailed in 18 U.S.C. § 922(o).  In 2009, BAE was a major proponent and lobbying force relating to the 2009 legislation (S.941 and H.R. 2296) to amend 18 U.S.C. 922(o).

(45)   As acknowledged by its lobbying memorandum dated May 22, 2009 and drafted by Kenneth Gatto, Manager of its "Firing Range Services and Support Group":

> "The statute does not allow machine guns to be lawfully transferred to, or possessed by, government contractors for use in testing, research, design or other work in fulfilling government contracts or for company internal research and development (IRAD) of products and/or services which may ultimately be sold to the United States Government."

- See Exhibit #2.

(46)   Despite BAE's aggressive lobbying efforts, the proposed legislation did not pass and was defeated demonstrating Congress' strong support of 18 U.S.C. § 922(o) and the strict limitations concerning the possession and manufacturing of machine guns.

(V)   KNOWING AND INTENTIONAL VIOLATIONS OF CONTRACT TERMS; KNOWING AND INTENTIONAL VIOLATIONS OF FEDERAL LAW AND FEDERAL REGULATIONS; AND KNOWING AND INTENTIONAL SUBMISSION OF FALSE STATEMENTS, FALSE RECORDS AND FALSE CLAIMS FOR PAYMENT TO THE GOVERNMENT

(47)   As of April 2011, BAE had delivered 94,000 Thermal Weapon Sights to the U.S. Military to support operations in Iraq and Afghanistan and subsequently recently entered into a

$56 Million contract with the Government for the production *and testing* of additional Thermal Weapon Sights.

(48)   With the inclusion of the herein-referenced April 2011 $56 Million contract with the U.S. Military, BAE will have billed the U.S. Government more than $1 Billion Dollars since 2004 for the production, manufacture *and testing* of Thermal Weapon Sights.

(49)   A material requirement, pre-condition and specification of the acceptance of the U.S. Military of each delivery from BAE of each Thermal Weapon Sight unit and related billing invoices and a material requirement, pre-condition and specification of the legal entitlement of BAE to be paid for the Thermal Weapon Sights was and has continually been the lawful and appropriate testing of the Thermal Weapon Sights by BAE in live fire weapons testing *utilizing military standard and military-spec machine guns or utilizing an "equivalent" to military standard and military-spec machine guns.* Such testing procedure was required by and was a material and necessary part of the specifications clearly included within the subject contracts and such testing procedures were part of what the U.S. Government bargained for, contracted for, and agreed to pay for in relationship to the Thermal Weapon Sights.   Such testing procedure had to be lawful and in conformance with strict federal law regulating the possession and manufacture of machine guns.

(50)   During all times relevant hereto, BAE has knowingly and intentionally failed to undertake such live fire weapons testing in a lawful manner in compliance with strict federal law regulating the possession and manufacture of machine guns.

(51)   Relative to said Thermal Weapon Sights produced and submitted by BAE to the U.S. Government along with presentment for payment, BAE has knowingly and intentionally made false statements, records and false express and false implied certifications to the

C:\Users\Lizzy\Desktop\11-09-13 VERIFIED 1ST AMENDQUI TAM COMPLAINT GOULDEN.doc

U.S. Government that the Thermal Weapon Sights were tested within contract specifications and in compliance with strict federal law regulating the possession and manufacture of machine guns.

(52) Further, BAE has knowingly presented false claims for payment to the U.S. Government as the testing requirements which were a legal prerequisite to any entitlement for any such payment had not in fact been met and satisfied by BAE and in fact, BAE violated strict federal law to meet said material testing specifications and requirements.[13]

(53) The Government was not aware and did not have knowledge that BAE was in unlawful possession of machine guns or that BAE was illegally manufacturing machine guns in violation of federal law in a fraudulent attempt to meet contractual testing requirements to the Thermal Weapon Sights.

(54) Even assuming that BAE had informed the Government in detail of all the pertinent information and underlying facts relating to BAE's illegal possession and illegal manufacture of machine guns, knowledge by a relevant Government official of the illegal actions of BAE to meet the testing specifications in the contract is not a defense of a violation of the False Claims Act.

(55) A Government officer including a Government contracting officer cannot have authorized BAE to violate strict federal law and federal regulations relating to the possession and manufacture of machine guns to meet the testing specifications in the contract.

---

[13] The False Claims Act imposes liability for "knowing" submissions of false claims to the Government. This requirement called "scienter" is met under 31 U.S.C. § 3729(b)(1) when a government contractor: 1) has actual knowledge of the information; 2) acts in deliberate ignorance of the truth or falsity of the information; or 3) acts in reckless disregard of the truth of the falsity of the information. In this case, BAE meets all three "knowingly" requirements relevant to the information that the machine guns that they were utilizing to test the thermal weapon sights as "equivalent" military standard and military-spec machine guns were illegally in their possession and illegally manufactured in violation of federal law and ATF and National Firearms Act regulations.

(56)  Each and every express or implied false certification of compliance and each invoice, bill, statement or other claim for payment submitted and presented by BAE to the Government related to the production and testing of the aforesaid Thermal Weapon Sights constitutes a false and fraudulent statement presented and tendered by BAE to induce a false claim paid to BAE by the Government.

(57)  Each such claim or invoice was a false claim and were rendered null and unenforceable by virtue of BAE's violation of and non-compliance with strict federal law and federal regulations relating to the possession and manufacturer of machine guns to meet the testing specifications of the Government contracts.

(58)  The Government made payment to BAE upon said false claims in reliance upon representations, statements and certifications from BAE that it had properly tested the Thermal Weapon Sights in conformance with contract specifications and in conformance with federal law and regulations relating to the possession and manufacture of machine guns.

(59)  If the Government had known that the testing certifications were false and had known that BAE was in unlawful possession of machine guns or that BAE was illegally manufacturing machine guns in violation of federal law in a fraudulent attempt to meet contractual testing requirements relating to the Thermal Weapon Sights, the Government would not have made payment on BAE's false claims.

C:\Users\Larry\Desktop\11-08-13 VMPD 1ST AMND QUI TAM COMPLAINT.GOULDEN.doc

## (VI)   RELEVANT CHRONOLOGY

**(A)**   **Chronology of Events**

(60)   In November of 2008, the Relator Timothy J. Goulden was initially hired as a contractor by BAE for the position of Manager of the Firing Range Services & Support Group (FRS & S Group).  On December 8, 2008, Mr. Goulden was hired as a full-time employee of BAE.

(61)   Timothy Goulden's immediate supervisor was Kenneth M. Gatto who held the position of Operations Manager RP.  Kenneth M. Gatto is an engineer by profession.

(62)   Kenneth Gatto informed Mr. Goulden that his role was to oversee and manage the FRS & S Group which had the primary function of production testing of Thermal Weapon Sights manufactured by BAE pursuant to a U.S. Military contract.  Mr. Gatto further informed that the Thermal Weapon Sights would be production-tested by the FRS & S Group by live weapons fire testing with use of U.S. Military weapons including M-4, M-240 machine gun and M2HB machine gun.

(63)   Mr. Goulden learned shortly thereafter that BAE was one of three (3) vendors who manufactured and supplied Thermal Weapon Sights described as "AN PAS13 Thermal Weapon Sights" to the U.S. Army.  He was informed that the Thermal Weapon Sight contract was "very valuable" to BAE.

(64)   Timothy Goulden was never provided a copy of BAE's contracts with the Government relating to the production and testing of Thermal Weapon Sights.  As noted herein, in December of 2010, he did see an attachment to Thermal Weapons Contract W91 CRB-07-D-0030 which referenced weapons to be used in the production testing of the Thermal Weapon Sights as military-spec firearms.

(65)    In early 2009, Mr. Goulden hired two (2) "Fire Teams" consisting of two (2) Range Safety Officers and four (4) shooters.

(66)    David Buchanan, who oversaw the live fire testing relating to the Thermal Weapon Sights for BAE prior to Mr. Goulden, had previously been terminated relating to numerous improprieties including weapons acquisition.

(67)    When Mr. Goulden took over the position of Manager of the FRS & S Group in late 2008 and early 2009 for BAE, he was confronted with a disorganized collection of equipment, ammunition and firearms in BAE's armory in Merrimack, New Hampshire.

(68)    Shortly after commencing his duties as manager of the FRS & S Group, Mr. Goulden learned that David Buchanan had obtained Type 10 and Type 11 Licenses for BAE and had utilized these licenses to "manufacture" at least one M2HB weapon and had purchased at least two M240 machine guns as well as an MK46 machine gun and two M249 machine guns and six M16 rifles.

(69)    After compiling his "Fire Teams" in or about February 2009, Mr. Goulden began oversight of his FRS & S Group's live weapons fire testing for the Group C. Thermal Weapon Sights on a monthly basis as well any engineering testing for the next iteration of Thermal Weapon Sights (i.e. 17 Micron) which involved live weapons fire.

(70)    The Group C testing was conducted upon three types of Thermal Weapon Sights (light, medium, and heavy) placed and affixed upon what contractually should have been military standard and mil-spec weapons including M16/M4 and variants, M240 and M2HB machine guns.

(71)    The weapons with the Thermal Weapon Sights attached were fired by Mr. Goulden's "Fire Teams" discharging an established amount of ammunition in combat-like

conditions to product test and ensure that the Thermal Weapon Sights would be functioning and operable in *actual combat conditions*.

(72)   This live weapons fire-testing for the Thermal Weapon Sights was initially conducted by the FRS & S Group at the Nashua Fish & Game location in Merrimack, New Hampshire and then in 2010 was moved to Epping, New Hampshire where BAE Systems IESI had established a new Armory and live weapons fire operation entitled "Sig Sauer".

(73)   The Thermal Weapon Sights were subjected to "Lot Testing" consisting of nine (9) Thermal Weapon Sights (three (3) heavy; three (3) medium; and three (3) light) for each lot. The subject Thermal Weapon Sights were hand-delivered *on a daily basis* from BAE facility in Lexington, Massachusetts where they *were manufactured*. They were delivered on a daily basis to Mr. Goulden and his FRS & S Group where they underwent live weapons fire operation. *At the end of each day's* live weapon's fire testing, the subject Thermal Weapon Sights were retrieved by BAE personnel and returned to the Lexington, Massachusetts facility.

(74)   After continued and repetitive use by the FRS & S Group of the existing weapon systems for live weapons fire product testing of the Thermal Weapon Sights, the weapon systems began to wear out and literally fall apart. Mr. Goulden became aware that instead of properly acquiring new Government furnished military standard and mil-spec weapons to conduct future live weapons fire-testing for the Thermal Weapon Sights, BAE sought to save costs by attempting to repair or refurbish the worn weapons in-house or attempted to have commercial manufacturers repair them. Further at this time, Mr. Goulden became aware that BAE was "obtaining" weapons to conduct the live weapons fire-testing of the Thermal Weapon Sights through a process BAE entitled, "Assisted Manufacture of NFA

Weapons". BAE was clearly aware that it was mandated to conduct its Thermal Weapon Sights with live weapons fire-testing.

(75)   Fully-aware that it was not a legally authorized "manufacturer" of machine guns and that it did not have the ability or facilities to completely manufacture the subject weapons needed to conduct the live weapons fire-testing, BAE commenced its "Assisted Manufacture of NFA Weapons". As part of this process, BAE would purchase the restricted part of the NFA weapon (i.e. side plate of the receiver for M240 and M2HB machine gun). Subsequently, the Armorer for BAE would place temporary rivets into the receiver and the machine gun would be sent to a commercial manufacturer under the pretense of a needed "repair". The M16/M4 rifles would be "manufactured" by BAE by purchase of a semi-automatic lower receiver (AR-15) and then conversion of the semi-automatic receiver into a fully-automatic receiver. This work was performed by employees of BAE.

(76)   Mr. Goulden became suspicious of this "Assisted Manufacture of NFA Weapons" process being utilized by BAE. Pursuant to same, Timothy Goulden undertook some research on procuring weapons rather than manufacturing them and contacted the Bureau of Alcohol, Tobacco & Firearms & Explosives ("ATF"). When Timothy Goulden informed BAE's legal counsel, Jody Grimolizzi that he had contacted the ATF relating to BAE's procurement and manufacture of machine guns, Mr. Goulden was subsequently sternly warned and forbidden that he should have no further contact with the ATF.

(77)   In or about April of 2009, legislation was being considered by the 111th Congress (H.R. 2296 and S.941) to allow Government contractors (such as BAE) to lawfully transfer or possess machine guns related to testing, research, design or other work fulfilling Government contracts.

(78)   On May 22, 2009, Kenneth Gatto, Operations Manager RP of BAE and Timothy Goulden's immediate supervisor, authored a lobbying memorandum in support of the proposed legislation.  In the memorandum he notes:

    (a)   Contract requirements relating to BAE's contract with the U.S. Army mandate *that mil-spec machine guns* be used in the live weapon fire-testing of the Thermal Weapon Sights.

    (b)   Under applicable U.S. Law, "U.S. companies cannot legally obtain modern machine guns (e.g. post-1986) for test purposes to fulfill Government contracts unless the machine guns are manufactured by the company,[14] provided to the company by the Government or obtained as part of law enforcement or Government demonstrated."

    (c)   "Manufacturing machine guns is a tricky and complicated business."

    (d)   Government contractors (like BAE) are incurring *"significant additional* costs" in *properly* acquiring machine guns manufactured to military specifications.  (See Exhibit #2.)

(79)   Despite the efforts of BAE, the proposed legislation did not pass and was defeated.

(80)   At or around during this same period of time in April of 2010, Kenneth Gatto informed Timothy Goulden that BAE had decided to send out Request for Proposals (RFP's) to outside contractors relating to the outsourcing of the live fire operations conducted by Mr. Goulden's FRS & S Group for the Thermal Weapon Sight contract testing.  Mr. Gatto informed Mr. Goulden that Thomas Arsenault, the President of BAE wanted "to get out of the gun business".  Notwithstanding same, Kenneth Gatto told Mr. Goulden

---

[14] As noted herein, under 27 CFR 478.11, BAE is not a "manufacturer" of weapons.

that the retention of his FRS & S Group would also be considered for the future live weapons fire-testing pursuant to Thermal Weapon Sight contracts.

(81)   Subsequently thereafter, Timothy Goulden became significantly concerned and questioned whether BAE was legally manufacturing the machine guns it was using for the live weapons fire-testing. In or about May of 2010, Mr. Goulden began to research and review applicable regulations and statutes relating to manufacturing of machine guns including: Title 18 U.S.C. § 922(o); Section 7.6.2 of the ATF National Firearms Act Handbook and 27 CFR 479.105. (See discussion hereinabove regarding these regulations and statutes.)

(82)   After review of the referenced statutes and regulations, Mr. Goulden forwarded an email in May of 2010 to his supervisor, Kenneth Gatto noting and outlining his concerns that BAE was illegally manufacturing machine guns.

(83)   Unfortunately, Timothy Goulden's father died in June of 2010 and Mr. Goulden was out of work for a period of time attending to family affairs. However, when he returned, he sent a second email to Kenneth Gatto in late July 2010 or early August 2010 renewing his concerns that BAE was illegally manufacturing machine guns.

(84)   Following the receipt of the second email to his attention from Timothy Goulden, Kenneth Gatto summoned Mr. Goulden to his office where he arranged for a telephone conference call with Attorney Jody Grimolizzi, legal counsel for BAE. Timothy Goulden detailed his concerns at this meeting/telephone conference with Kenneth Gatto and Attorney Grimolizzi informing that he discovered a disparity between the applicable law and regulations and BAE manufacturing practices relating to machine guns. Attorney Grimolizzi was very abrupt and short with Mr. Goulden and asked him:

> "What is this—an ethics complaint or something?
> "Why bring this up now?"

Attorney Grimolizzi ended the conversation by stating that she would get back to Mr. Goulden after she reviewed the matter. **Neither Attorney Grimolizzi nor any other supervisor, officer, manager or employee of BAE ever contacted Timothy Goulden to discuss his stated concerns.**

(85)   On or about August 25, 2010, Mr. Goulden discussed his concerns regarding the illegal manufacture of weapons used in the live weapons fire-testing for the Thermal Weapon Sights with Frank Henderson who was an employee of BAE in the Safety Health & Environment Department. This is confirmed by the entry of August 26, 2010 in Mr. Henderson's job log which he notes:

> "Note:   When speaking w/Tim Goulden yesterday, he mentioned that in his discussion w/Ken Gatto, the subject of whether we were legally possessing BAE's Firearms or not
>
> - Tim told Ken that he did not believe we were in legal possession.
>
> - He told Ken that I had discussed this issue previously and that I was in agreement w/him."
>
> - See Exhibit #3.

(86)   Frank Henderson further notes in his job log that he spoke with Ty Perry, Director of the Safety Health & Environment Department (now retired) of BAE about the issue of the illegal manufacture and possession of weapons by BAE and Ty Perry advised that this issue **"should not be placed in writing"**:

> "- Spoke to Ty regarding issue w/Firearms & Possession.
>
> - He does not think my evaluation should be placed in writing at this time.
>
> - Too late. See pgs. 102 & 103."
>
> - See Exhibit #3.

(87) Frank Henderson's job log contains a detailed "Memo for Record" dated August 26, 2010 concerning the illegal manufacture and possession of machine guns by BAE.  (See Exhibit #3.)

(88) Notwithstanding the fact that Mr. Goulden had clearly brought the issue of BAE's illegal manufacture and possession of machine guns used in the live weapons fire testing for the Thermal Weapon Sights to the attention of BAE supervisors and managers including Mr. Goulden's supervisor, Kenneth Gatto; legal counsel for BAE, Attorney Jody Grimolizzi; and an employee in BAE's Safety, Health & Environment Department, Frank Henderson who in turn brought the issue to BAE's Director of the Safety Health and Environment Department, Ty Perry, BAE knowingly and acting in deliberate ignorance of relevant federal law and federal regulations regarding the manufacture and possession of machine guns knowingly and intentionally failed to inquire of or contact appropriate Government and ATF officials regarding the appropriateness and legality of their manufacture and possession of machine guns for the sole purpose of live weapons fire testing of the Thermal Weapon Sights.

(89) Notwithstanding the fact that Mr. Goulden has clearly brought the issue of BAE's illegal manufacture and possession of machine guns used in the live weapons fire testing for the Thermal Weapon Sights to the attention of BAE supervisors and managers including Mr. Goulden's supervisor, Kenneth Gatto; legal counsel for BAE, Attorney Jody Grimolizzi; and an employee in BAE's Safety, Health & Environment Department, Frank Henderson who in turn brought the issue to BAE's Director of the Safety, Health & Environment Department, Ty Perry, BAE knowingly and acting in reckless disregard of relevant federal law and federal regulations regarding the manufacture and possession of machine guns knowingly and intentionally failed to inquire of or contact appropriate Government

and ATF officials regarding the appropriateness and legality of their manufacture and possession of machine guns for the sole purpose of live weapons fire testing of the Thermal Weapon Sights.

(90)   Subsequently thereafter, Timothy Goulden and his FRS & S Group continued their work on the live weapons fire-testing for the Thermal Weapon Sights with the hope they would be retained for future work.   However, it became apparent over time that the live weapons fire-testing would be outsourced.   In February of 2011, it was confirmed that the live fire weapons testing for future Thermal Weapon Sights was going to be outsourced to an outside company called, "Special Tactical Services" located in Virginia Beach, Virginia.

(91)   Timothy Goulden was told by Kenneth Gatto that the live weapons fire-testing work was outsourced to "Special Tactical Services" in Virginia Beach, Virginia not because they were the most qualified or efficient choice but because BAE "did not want any negative publicity appearing on Channel 9."[15]

(92)   Subsequently, employees of the FRS & S Group were either terminated or re-assigned by BAE.   Notwithstanding same, Timothy Goulden continued his employment with BAE and actually assisted in the contract negotiations with Special Tactical Services.   Further, Mr. Goulden was directed to prepare an inventory and assist Special Tactical Services with its contract.

**(B)**   **Retaliatory Termination Actions By BAE**

(93)   Upon returning from Virginia Beach, Virginia where Mr. Goulden was assisting Special Tactical Services' transition into its live weapons fire contract, Timothy Goulden was

---

[15] Channel 9 is the major television station in New Hampshire.

summoned into Kenneth Gatto's office on June 22, 2011 for a meeting at which Beth Bursey—Human Resources Manager and Michael Levin—Director of Ethics was present. Among the matters of which Mr. Goulden was interrogated was whether he gave away BAE property and whether he used a respirator during the live weapons fire-testing.

(94)   Mr. Goulden answered all questions honestly and completely. He informed that he allowed members of his group to keep tools, helmets and body armor that they utilized while employees of the FRS & S Group and that BAE had scheduled and planned for destruction. **Timothy Goulden did not take or keep any materials or equipment for himself**. Notwithstanding same, Mr. Goulden was placed on administrative leave on June 22, 2011.

(95)   On June 28, 2011, Kenneth Gatto contacted Timothy Goulden by telephone and informed him that property and materials were missing from the Armory. Mr. Goulden informed Mr. Gatto as to the exact location of the alleged "missing" property. Mr. Goulden confronted Mr. Gatto and inquired as to whether BAE's investigation of him was in retaliation of his raising the issue of the illegal manufacture of weapons by BAE. Kenneth Gatto refused to answer this inquiry but did note that he believed that Mr. Goulden was "honorable".

(96)   On June 30, 2011, Human Resource Manager Beth Bursey contacted Timothy Goulden to inform that other property was missing although the other alleged "missing" property was found. On July 14, 2011, Mr. Goulden met with Beth Bursey, Michael Levin—Director of Ethics and Attorney Jody Grimolizzi and answered all questions presented. After the meeting, Mr. Goulden confronted Beth Bursey and inquired as to why his complaints about the illegal manufacture of weapons had never been addressed. She denied

knowledge of Mr. Goulden's complaints and informed she would look into the matter and get back to him.

(97)   On July 21, 2011 Mr. Goulden was summoned by Beth Bursey to the headquarters of BAE and informed that he was being terminated.

(98)   Not surprisingly, Beth Bursey never responded to Timothy Goulden's concerns regarding the illegal manufacture of weapons by BAE.

(99)   On July 21, 2011, Mr. Goulden received a letter of termination attempting to substantiate the "serious nature" of misconduct which essentially consisted of not wearing a respirator during live weapons fire-testing and allowing members of the FRS & S Group to maintain and keep personal equipment and tools which were destined to be discarded and destroyed.

(100)  Timothy Goulden vehemently denies and disputes the allegations and substance of same as presented in the July 21, 2011 letter.  Mr. Goulden further asserts that his termination and the manner of his termination was in direct retaliation for his raising and bringing to the attention of supervisors, officers and managers of BAE of the significant and serious issue of the illegal manufacture and possession of weapons by BAE for use of testing of the manufactured Thermal Weapon Sights to meet contractual testing equipment of Government contracts.

(VII)   LEGAL CLAIMS FOR RELIEF

## COUNT I

### VIOLATIONS OF THE FCA, 31 U.S.C. § 3729(a)(1)(A)

(101)   The Plaintiff-Relator repeats and re-alleges each and every allegation as set forth in Paragraphs 1 through 100 as though set forth fully herein.

(102)   The Defendant BAE knowingly presented or caused to be presented to an officer or employee of the United States Government false or fraudulent claims for payment or approval, all in violation of the FCA, 31 U.S.C. § 3729(a)(1)(A).

(103)   The Defendant BAE Systems, Inc. of which the Defendant BAE is a subsidiary knowingly presented or caused to be presented to an officer or employee of the United States Government false or fraudulent claims for payment or approval, all in violation of the FCA 31 U.S.C. § 3729(a)(1)(A).

(104)   The United States Government detrimentally relied upon false express and false implied certifications by BAE and BAE Systems, Inc. that the Thermal Weapon Sights were tested within contract specifications and in compliance with strict federal regulations and federal law regulating the possession and manufacture of machine guns resulting in the submission of false claims and the United States Government paid said claims and has sustained damages because of these acts by the Defendants.

(105)   By virtue of BAE's and BAE System, Inc.'s hereinabove described acts and violation of and non-compliance with strict federal law and federal regulations relating to the possession and manufacture of machine guns to meet the testing specifications of Government contracts, the Defendant BAE and BAE Systems, Inc. knowingly presented or caused to be presented to an officer or employee of the United States Government,

false or fraudulent claims for payment or approval, all in violation of the FCA, 31 U.S.C. § 3729(a)(1)(A) and as a result, the United States Government has been damaged in amounts equal to amounts of all such payments made as the Defendant BAE was not legally or contractually entitled to receive any such payments relating to the production and testing of the Thermal Weapon Sights.

## COUNT II

### VIOLATIONS OF THE FCA, 31 U.S.C. § 3729(a)(1)(B)

(106)  The Plaintiff-Relator repeats and re-alleges each and every allegation as set forth in Paragraphs 1 through 105 as though set forth fully herein.

(107)  The Defendant BAE knowingly made, used and caused to be made false records, certifications and statements to get false and fraudulent claims paid or approved by the United States Government, all in violation of FCA, 31 U.S.C. § 3729(a)(1)(B).

(108)  The Defendant BAE Systems, Inc. of which the Defendant BAE is a subsidiary knowingly made, used or caused to be made false records, certifications and statements to get false and fraudulent claims paid or approved by the United States Government, all in violation of 31 U.S.C. § 3628(a)(1)(B).

(109)  The United States Government detrimentally relied upon the false records, certifications and statements resulting in the submission of false claims and paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT III

### VIOLATIONS OF THE FCA, 31 U.S.C. § 3729(a)(1)(C)

(110)   The Plaintiff-Relator repeats and re-alleges each and every allegation as set forth in Paragraphs 1 through 109 as though set forth fully herein.

(111)   The Defendant BAE knowingly conspired to defraud the United States Government by getting false or fraudulent claims allowed or paid, all in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(C).

(112)   The Defendant BAE Systems, Inc. of which the Defendant BAE is a subsidiary conspired to defraud the United States Government by getting false or fraudulent claims allowed or paid, all in violation of the False Claims Act, 31 U.S.C. § 3729(A)(1)(C).

(113)   The United States Government detrimentally relied upon false records and certifications and statements resulting in the submission of false claims as part of a conspiracy to defraud the United States Government and paid claims and has sustained damages because of these acts by the Defendants.

## COUNT IV

### VIOLATIONS OF THE FCA, 31 U.S.C. § 3730(h)

(114)   The Plaintiff-Relator repeats and re-alleges each and every allegation as set forth in Paragraphs 1 through 113 as though set forth fully herein.

(115)   The Defendant BAE discharged, demoted, suspended, threatened, harassed and otherwise discriminated against the Plaintiff-Relator Timothy J. Goulden because of his lawful acts and actions involving potential violations of the FCA by his employer, BAE. By these actions, the Defendant BAE violated the FCA, 31 U.S.C. § 3730(h).

C:\Users\Lizzy\Desktop\11 09 13 VRFD 1ST AMND QUI TAM COMPLAINT GOULDEN.doc

(116) The Plaintiff-Relator has been damaged as a result of these illegal actions. He has suffered great economic harm, loss of income and emotional injury.

## COUNT V

## WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY

(117) The Plaintiff-Relator repeats and re-alleges each and every allegation as set forth in Paragraphs 1 through 116 as though set forth fully herein.

(118) At the time of his termination of employment on July 21, 2011, the Plaintiff-Relator Timothy J. Goulden was an employee of the Defendant BAE serving as Manager of the Firing Range Services & Support Group (FRS & S Group) for BAE.

(119) The Defendant BAE in bad faith, wrongfully terminated Timothy J. Goulden's employment in violation of public policy in retaliation against his actions in bringing forward to his supervisors and legal counsel at BAE that: a) BAE was illegally manufacturing and possessing machine guns in a fraudulent attempt to meet the contractual testing requirements relating to the testing of Thermal Weapon Sights under Government contracts; b) BAE had previously obtained licenses to illegally "manufacture" and "repair" weapons under false pretenses and utilized those licenses to illegally manufacture or arrange for the illegal "manufacture" of machine guns for use in testing of the subject Thermal Weapon Sights.

(120) As a direct and proximate result of the wrongful termination of Timothy J. Goulden in violation of public policy, Timothy J. Goulden suffered and continues to suffer loss of income, loss of benefits, loss of personal and professional reputation, loss of professional opportunities and other losses including emotional distress and mental suffering.

## COUNT VI

### WRONGFUL TERMINATION IN VIOLATION OF RSA 275-E: 2

(121)   The Plaintiff-Relator repeats and re-alleges each and every allegation as set forth in Paragraphs 1 through 120 as though set forth fully herein.

(122)   At the time of his termination of employment on July 21, 2011, the Plaintiff-Relator Timothy J. Goulden was an employee of the Defendant BAE serving as Manager of the Firing Range Services & Support Group (FRS & S Group) for BAE.   Mr. Goulden provided his employment services to the Defendant BAE in Merrimack and Epping, New Hampshire.

(123)   The Defendant BAE in bad faith, wrongfully terminated Timothy J. Goulden's employment in violation of New Hampshire Revised Statutes Annotated RSA 275-E:2 in retaliation against his actions in bringing forward to his supervisors and legal counsel at BAE that:   a) BAE was illegally manufacturing and possessing machine guns in a fraudulent attempt to meet contractual testing requirements relating to the testing of Thermal Weapon Sights under Government contracts; b) BAE had previously obtained licenses to illegally "manufacture" and "repair" weapons under false pretenses and utilized those licenses to illegally manufacture or arrange for the illegal "manufacture" of machine guns for use in testing of the subject Thermal Weapon Sights.

(124)   As a direct and proximate result of the wrongful termination of Timothy J. Goulden in violation of RSA 275-E:2, Timothy J. Goulden suffered and continues to suffer loss of income, loss of benefits, loss of personal and professional reputation, loss of professional opportunities and other losses including emotional distress and mental suffering.

## COUNT VII

## WRONGFUL TERMINATION IN VIOLATION OF M.G.L. CHAPTER 149 § 185

(125)   The Plaintiff-Relator repeats and re-alleges each and every allegation as set forth in Paragraphs 1 through 124 as though set forth fully herein.

(126)   At the time of his termination of employment on July 21, 2011, the Plaintiff-Relator Timothy J. Goulden was an employee of the Defendant BAE serving as Manager of the Firing Range Services & Support Group (FRS & S Group) for BAE which had a principal place of business at 2 Forbes Road, Lexington, Middlesex County, Massachusetts.

(127)   The Defendant BAE in bad faith, wrongfully terminated Timothy J. Goulden's employment in violation of Massachusetts General Laws M.G.L. Chapter 149 § 185 in retaliation against his actions in bringing forward to his supervisors and legal counsel at BAE that:  a) BAE was illegally manufacturing and possessing machine guns in a fraudulent attempt to meet contractual testing requirements relating to the testing of Thermal Weapon Sights under Government contracts; b) BAE had previously obtained licenses to "manufacture" and "repair" weapons under false pretenses and utilized those licenses to illegally manufacture or arrange for the illegal "manufacture" of machine guns for use in testing of the subject Thermal Weapon Sights.

(128)   As a direct and proximate result of the wrongful termination of Timothy J. Goulden in violation of M.G.L. Chapter 149 Section 185, Timothy J. Goulden suffered and continues to suffer loss of income, loss of benefits, loss of personal and professional reputation, loss of professional opportunities and other losses including emotional distress and mental suffering.

## **PRAYERS FOR RELIEF**

WHEREFORE, the Plaintiff-Relator respectfully requests this Court to enter Judgment and Orders against the Defendants as follows:

(1)    That this Court enter judgment against the Defendants in an amount equal to three times the amount of damages the United States Government has sustained because of the Defendant's actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729;

(2)    That the Plaintiff-Relator be awarded the maximum amount allowed him as Relator's share pursuant to 31 U.S.C. § 3730(d) of the FCA and for reasonable expenses, attorney's fees, costs and expenses incurred by Relator;

(3)    For Count IV, that the Plaintiff-Relator be granted relief and awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(h);

(4)    For Counts V, VI and VII that the Plaintiff-Relator be awarded compensatory damages, multiple damages, punitive damages, exemplary damages, attorney's fees and costs;

(5)    That the Plaintiff-Relator and the United States of America be afforded such other relief as the Court deems just and equitable.

## **DEMAND FOR JURY TRIAL**

Plaintiff/Relator Requests a Trial By Jury on all Counts So Triable on behalf of himself and the United States Government.

## DEMAND FOR JURY TRIAL

Plaintiff/Relator Requests a Trial By Jury on all Counts So Triable on behalf of himself and the United States Government.

Respectfully Submitted,
United States of America Ex Rel. Timothy J. Goulden
By Plaintiff-Relator's Attorney,

Date:   December 9, 2013            _____/s/ Robert C. Autieri_____
Robert C. Autieri, Esquire B.B.O. # 024342
LAW OFFICES OF ROBERT C. AUTIERI
Willows Professional Park
811 Turnpike Street
North Andover, MA 01845-6133
978-681-0737
rcalaw1@aol.com

## VERIFICATION

I, TIMOTHY J. GOULDEN, verify that the statements in the within Verified First Amended *Qui Tam* Complaint made by me are true and correct to the best of my knowledge, information and belief.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.


DATED: _____December 9,_____ 2013 _____
                                                    Timothy J. Goulden