United States District Court
District of Massachusetts

```
_____
                                  )
UNITED STATES OF AMERICA EX REL.  )
TIMOTHY J. GOULDEN,               )
                                  )
          Plaintiffs,             )
                                  )
          v.                      )    Civil Action No.
                                  )    11-12017-NMG
BAE SYSTEMS INFORMATION AND       )
ELECTRONIC SYSTEMS INTEGRATION,   )
INC. and BAE SYSTEMS, INC.        )
                                  )
          Defendants.             )
_____)
```

<u>**MEMORANDUM & ORDER**</u>

GORTON, J.

Relator Timothy Goulden ("relator" or "Goulden") brings this qui tam False Claims Act action against his former employer, BAE Systems Information and Electronic Systems Integration, Inc. ("BAE"), and its parent company, BAE Systems, Inc. His claims relate to the manufacture and testing of thermal weapon sights pursuant to several contracts between BAE and the United States Army. Goulden maintains that the subject contracts required BAE to test its thermal weapon sights using "military standard or military-spec" machine guns and that BAE falsely certified that it had performed the testing under those conditions when it submitted claims for payment. He also maintains that he was terminated from his position at BAE as a

result of his investigation into such violations. The United States has declined to intervene in the action.

Pending before the Court are a motion to dismiss by the defendants and a motion for leave to file a second amended complaint by Goulden. For the reasons that follow, both motions will be allowed, in part, and denied, in part.

## I. <u>Background</u>

### A. **Contracts between BAE and the U.S. Army**

BAE is a defense contractor that used to make "thermal weapon sights" for the U.S. Army. Thermal weapon sights are infra-red imaging sensors that allow soldiers to observe images on the battlefield notwithstanding darkness or smoky conditions.

BAE entered into at least three contracts with the government for the manufacture and testing of thermal weapon sights: an initial contract entered into in or about 2003 ("the 2003 contract"), a second entered into in mid-2007 ("the 2007 contract") and a third entered in April, 2011 ("the 2011 contract"). The 2007 contract resulted in a purchase order worth approximately $183 million and the 2011 contract resulted or will result in an order of approximately $56 million.

According to the terms of the contracts, BAE was required to perform "live fire weapons testing" on the sights under simulated battlefield conditions. It performed the testing by shipping thermal weapon sights from its production facility in

Lexington, Massachusetts to its "Firing Range Services and Support Group" ("FRSS Group") in New Hampshire. The FRSS Group would test the sights before returning them to Lexington for shipment to the Army. Relator supervised the FRSS Group testing between November, 2008 and July, 2011.

According to Goulden, the 2003 contract called for the live fire weapons testing to be performed with "military standard and military-spec machine guns" being used by soldiers in combat. He admits that he has not seen a complete copy of any of the contracts but submits three documents to substantiate his claim.

First, Table 3.3.6.9.2-1 of the 2007 contract lists different weapons but does not specify that those weapons are considered "military standard" or "military-spec" by either of the parties. In the Proposed Second Amended Complaint, Goulden notes that all of the listed weapons begin with the letter "M" and explains that it is "well known" in the firearms industry and the U.S. Army that the "M" identifies the weapon as a military standard or military-spec machine gun.

Second, a 2008 PowerPoint presentation by Paul Kling, the Vice President of Operations at BAE, stated that Section 3.3.6.9.2 of the contract "details the weapon configuration" and explained that "[w]eapons firing is the best check on how the system is working in the soldier's hands."

Third, Kenneth Gatto ("Gatto"), the manager of the FRSS Group, stated that the firearms specified by contract were "Mil-spec machineguns" in a memorandum titled "BAE Systems Proposed Change to Bills S. 941 and H.R. 2296" dated May 22, 2009 ("the BAE Lobbying Memorandum"). The memorandum adds that "[o]btaining these machineguns has been very problematical for BAE Systems...."

After the award of the 2003 contract, BAE requested and the Army agreed to modify that provision to state that BAE could perform the testing using "military standard and military-spec machine guns or their equivalent." Goulden asserts that the Army did not have the legal authority to permit BAE to possess or manufacture "equivalents" to military standard or military-spec machine guns because the ATF has exclusive authority to enforce and oversee the implementation of federal firearms laws.

**B.    Efforts by BAE to Obtain Machine Guns for Testing**

BAE purchased machine guns from several entities between 2003 and 2004. Goulden asserts that those purchases were unlawful according to the ATF National Firearms Act Handbook because the ATF understands 18 U.S.C. § 922(o) to permit transfer of machine guns to government contractors only for export or as "sales samples" and does not permit transfer for research or testing purposes. Gatto's BAE Lobbying Memorandum acknowledges that

> [18 U.S.C. § 922(o)] does not allow machineguns to be
> lawfully transferred to, or possessed by, government
> contractors for use in testing, research, design, or
> other work in fulfilling government contracts....

The memorandum recommends that the language of § 922(o) be
modified to permit government contractors to obtain machine guns
for purposes relating to their government contracts.

At or around the time the government awarded the 2003
contract, BAE obtained federal "Type 10" and "Type 11" firearms
licenses.  An entity with a Type 10 license is permitted to
manufacture "Title 1" firearms and various types of ammunition
whereas an entity with a Type 11 license may import the same.
Goulden asserts that BAE is not "in the business of
manufacturing" firearms or ammunition and therefore is not a
"manufacturer" according to Alcohol, Tobacco and Firearms
("ATF") regulations.  See 27 C.F.R. 478.11.  He therefore
concludes that the license was obtained by fraud.

In order to obtain machine guns for use in testing, BAE
contracted with a commercial gun manufacturer, Ohio Ordnance
Works ("Ohio Ordnance"), to carry out what Goulden calls an
"Assisted Manufacture Scheme".  Under that scheme, BAE would
obtain only the "restricted" parts of weapons and send them to
Ohio Ordnance under the pretense that they were weapons in need
of "repairs".  Ohio Ordnance would assemble complete machine
guns and return them to BAE.  When the guns would break apart in

the field after use, BAE employees would repair them with replacement parts.

As a result, according to Goulden, the machine guns used to test thermal weapon sights were not "equivalent" to military standard or military-spec machine guns and instead were "cobbled together weapons with non-standard, untested, mismatched parts of unknown quality." Notwithstanding that fact, Goulden contends that BAE falsely certified to the government in its claims for payment that it had tested thermal weapon sights using weapons that were the equivalent of military standard or military-spec machine guns. He contends that the government relied upon the subject misrepresentations or omissions in issuing payments pursuant to the contracts and would not have paid BAE if it had known about the true testing conditions.

C. **Termination of Goulden**

While employed by BAE, Goulden became concerned about the "Assisted Manufacture Scheme." At some point he contacted the ATF about those concerns. Goulden told BAE's Legal Counsel, Jody Grimolizzi ("Grimolizzi"), that he had relayed his concerns to the ATF. According to Goulden, she asked him not to contact the ATF in the future.

In April, 2010, Gatto informed Goulden that BAE was considering outsourcing its live fire testing. Shortly thereafter, Goulden told Gatto that he was concerned that BAE

was illegally manufacturing machine guns.  In August, 2010, following a meeting with Gatto and Grimolizzi, he voiced the same concerns to Frank Henderson, an employee of the Safety, Health and Environment Department of BAE, who told the director of his Department.

In February, 2011, Goulden learned that BAE was outsourcing future live fire testing of thermal weapon sights.  Goulden maintains that Gatto told him that the reason for outsourcing the testing was to avoid negative publicity.  Goulden and the other employees of the FRSS Group concluded the remaining testing and were terminated or reassigned.

Goulden was initially reassigned.  In June, 2011, however, he was called to a meeting with Gatto, Human Resources Manager Beth Bursey and Director of Ethics Michael Levin.  At the meeting, he was asked whether he permitted former FRSS Group employees to keep BAE property such as tools, helmets and body armor and whether he had failed to wear a respirator during live fire testing.  He answered all of the questions truthfully. About a week later, he asked Gatto if he was being investigated in retaliation for his raising the issue of the illegal manufacture of weapons by BAE but received no response.

The following month, Goulden met with Bursey, Levin and Grimolizzi about the missing property.  During the meeting, he asked Bursey why his complaints about the illegal manufacture of

weapons had never been addressed.  She denied any knowledge of
the complaints and said she would get back to him.

One week later, Bursey informed Goulden that he was
terminated from his position with BAE.  His termination letter
stated that he had engaged in misconduct of a "serious nature"
by not wearing a respirator during live fire weapons testing and
by allowing members of the FRSS Group to keep BAE property.
Goulden believes that the property he allowed them to keep would
have been destroyed by the company in any event.

## II.  **Procedural History**

Relator filed his initial Complaint in November, 2011.  It
was not until August, 2013, however, that the United States
notified the Court that it had elected to decline intervention
in the case.  In December, 2013, Relator voluntarily dismissed
his claims against BAE Systems, PLC and filed a First Amended
Complaint.

The First Amended Complaint alleges that BAE violates
several sub-sections of the federal False Claims Act, 31 U.S.C.
§§ 3729-3733, by presenting false claims to the Army (Count I),
making false statements or records (Count II), conspiring with
Ohio Ordnance to commit such violations (Count III) and
retaliating against Goulden for investigating and reporting his
concerns (Count IV).  It also asserts claims of statutory and

common law wrongful discharge under the laws of New Hampshire and Massachusetts (Counts V, VI and VII).

Defendants moved to dismiss the First Amended Complaint in January, 2014. Relator has opposed the motion to dismiss and seeks leave to file a Second Amended Complaint that omits the claim of retaliatory discharge under M.G.L. ch. 149, § 185 and alleges additional facts in support of the other claims.

## III. **Motions to Dismiss and for Leave to Amend**

### A. **Legal Standard**

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). In considering the merits of a motion to dismiss, the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. Langadinos v. Am. Airlines, Inc., 199 F.3d 68, 69 (1st Cir. 2000). Yet "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," do not suffice to state a cause of action. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Accordingly, a complaint does not state a claim for relief where the well-pled facts fail to warrant an inference of anything more than the mere possibility of misconduct. Id. at 679.

Here, relator requests that the Court either deny the motion to dismiss or dismiss the case without prejudice and permit him to file the Proposed Second Amended Complaint. As a result, the standards governing motions for leave to amend pursuant to Fed. R. Civ. P. 15(a)(2) apply.

A court "should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). Although Rule 15 has been construed liberally, amendment is not warranted if it would be futile. See Resolution Trust Corp. v. Gold, 30 F.3d 251, 253 (1st Cir. 1994). An amendment is "futile" if the amended claim would fail to state a claim upon which relief can be granted. Glassman v. Computervision Corp., 90 F.3d 617, 623 (1st Cir. 1996).

### B. False Claims Act Claims (Counts I - IV)

#### 1. Legal Framework for FCA Claims

Liability under the False Claims Act ("FCA") arises when a "provider knowingly asks the Government to pay amounts it does not owe." U.S. ex rel. Clausen v. Lab. Corp. of Am., 290 F.3d 1301, 1311 (11th Cir. 2002). The qui tam provisions of the FCA supplement federal law enforcement resources by allowing whistleblowers (known as relators) to bring certain fraud claims on behalf of the government. U.S. ex rel. Duxbury v. Ortho Biotech Prods., L.P., 579 F.3d 13, 16 (1st Cir. 2009). In return, a relator is entitled to a portion of the proceeds from

the suit, whether or not the government elects to intervene as an active participant in the action. Id.

In relevant part, the FCA imposes liability on persons or entities who (1) knowingly "present" or otherwise cause the presentation of false or fraudulent claims to the government, (2) knowingly make, use or cause false or fraudulent records or statements to be submitted to the government or 3) conspire with others to accomplish such ends. See 31 U.S.C. § 3729(a).  It also forbids retaliatory discharge based upon an employees efforts to stop violations of the FCA. See 31 U.S.C. § 3730(h).

Because Goulden's FCA claims sound in fraud, they must be pled with the specificity required by Fed. R. Civ. P. 9(b). That rule provides that "a party must state with particularity the circumstances constituting [the alleged] fraud." U.S. ex rel. Gagne v. City of Worcester, 565 F.3d 40, 45 (1st Cir. 2009).  Under that standard, a relator must do more than merely "suggest fraud was possible," and, at a minimum, the complaint must specify the "time, place, and content of an alleged false representation." Id.  In other words, the relator must set forth "the who, what, where, when, and how of the alleged fraud." U.S. ex rel. Walsh v. Eastman Kodak Co., 98 F. Supp. 2d 141, 147 (D. Mass. 2000).  Conclusory accusations related to "plans and schemes" are insufficient. U.S. ex rel. Rost v. Pfizer, Inc., 507 F.3d 720, 731 (1st Cir. 2007) ("Rost II").  Rule 9(b) may,

however, be satisfied where "some questions remain unanswered" as long as "the complaint as a whole is sufficiently particular to pass muster under the FCA." Gagne, 565 F.3d at 45.

### 2. 31 U.S.C. § 3729(a)(1)(A)

#### a. Legal Standard

In order to establish liability for "presentment" under 31 U.S.C. § 3729(a)(1)(A), a relator must prove that the defendant

> (1) present[ed] or cause[d] to be presented to the United States government, a claim for approval or payment, where (2) that claim is false or fraudulent, and (3) the action was undertaken 'knowingly,' in other words, with actual knowledge of the falsity of the information contained in the claim, or in deliberate ignorance or reckless disregard of the truth or falsity of that information.

U.S. ex rel. Nowak v. Medtronic, Inc., 806 F. Supp. 2d 310, 342 (D. Mass. 2011) (citations and quotations omitted).

The First Circuit Court of Appeals has held that a qui tam relator must "provide details that identify particular false claims for payment that were submitted to the government" in order to satisfy the particularity requirements of Rule 9(b). Karvelas, 360 F.3d at 232. In the context of Medicare kickback scheme, Karvelas suggested that such details include

> the dates of the claims, the content of the forms or bills submitted, their identification numbers, the amount of money charged to the government, the particular goods or services for which the government was billed, the individuals involved in the billing, and the length of time between the alleged fraudulent practices and the submission of claims based on those practices....

Id. at 233.

### b.  Application

BAE makes much of the fact that neither the First Amended Complaint nor the Proposed Second Amended Complaint identify with particularity any claim or invoice submitted under the contracts.  Nevertheless, there is adequate detail in both complaints to satisfy the first element of presentment under § 3279(a)(1).  Relator has identified several fixed-price contracts between defendants and the U.S. Army, including one by number, and has disclosed the value or approximate value of each of those contracts.  At this stage of the litigation, there is no need for the relator to identify particular invoices by date or number or to identify the particular employee who submitted them.  It requires no stretch of the imagination to infer that BAE Systems sought and obtained at least some payments for the work it performed under its very lucrative contracts and, under the theory advanced by the relator, any and every invoice submitted pursuant to the contracts would be a false claim because it would certify that testing performed in exchange for payment complied with certain conditions.  See U.S. ex rel. Hood v. Satory Global, Inc., 946 F. Supp. 2d 69, 84 (D.D.C. 2013) (finding that failure to identify particular invoices was not fatal in case involving contract to provide services to the DOJ where plaintiff lacked access to billing records).

Goulden cannot, however, show that BAE submitted any false or fraudulent claims to the government, much less that false or fraudulent claims were submitted "knowingly".  Here, he relies upon a theory of "false certification" and alleges that compliance with contractual terms related to testing, certain federal statutes and ATF regulations was a material precondition for payment by the Army and, in submitting claims for payment, BAE "impliedly certified" that it had complied with the applicable contract terms, statutes and regulations, when in fact it had not.

In United States ex rel. Hutcheson v. Blackstone Medical, Inc., the First Circuit held that an entity submits a false claim if it states in connection with its claim for payment that it understands that payment is conditioned on compliance with applicable federal statutes and regulations. 647 F.3d 377, 393-94 (1st Cir. 2011).  The same rule applies where payment is conditioned on compliance with a term of a contract. Id.

The test for whether an entity made a false certification proceeds in two stages.  First, a court must determine "whether the claims at issue ... misrepresented compliance with a precondition of payment so as to be false or fraudulent." Id. at 392.  Second, it must decide whether any such misrepresentation was "material". Id.  The inquiry is "fact-intensive and context-

specific." <u>New York</u> v. <u>Amgen Inc.</u>, 652 F.3d 103, 111 (1st Cir. 2011).  A false statement is "material" if it has a

> natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed.

<u>Hutcheson</u>, 647 F.3d at 394 (quoting <u>U.S. ex rel. Loughren</u> v. <u>Unum Grp.</u>, 613 F.3d 300, 307 (1st Cir. 2010)) (alteration in original).  Materiality may be established in various ways such as express language in the contract or testimony that both parties to the contract understood that payment was conditional on compliance with the subject requirement.  <u>Id.</u> (citing <u>U.S.</u> v. <u>Sci. Apps. Int'l Corp.</u>, 626 F.3d 1257, 1279 (D.C. Cir. 2010).

Here, Goulden's allegations fail to satisfy even the first step of the test.  First, to the extent that his theory is premised upon his belief that the machine guns assembled with the aid of Ohio Ordnance were obtained in violation of federal law and that BAE obtained fraudulently its Type 10 license to manufacture machine guns, he fails to state a claim of false certification.  A qui tam FCA complaint is not the proper vehicle to challenge non-compliance with federal law or regulations unless the noncompliance is related to the submission of a false claim for payment to the government.  <u>U.S. ex rel. Escobar</u> v. <u>Universal Health Servs., Inc.</u>, No. 11-11170-DPW, 2014 WL 1271757, at *6 (Mar. 26, 2014) (citing <u>Rost II</u>, 507 F.3d at 727) ("A plaintiff may not use the FCA to act as an

ombudsman for compliance with regulatory requirements that do not necessarily impact government payment.").

Second, even if the Court accepted as true that the contracts required testing to be performed with certain kinds of machine guns, Goulden provides no factual support for his assertion that BAE was required by contract to certify that it had tested the thermal weapon sights using "military standard", "military spec" or "equivalent" machine guns or that the Army conditioned payment thereon. See Hutcheson, 647 F.3d at 394; see also U.S. ex rel. Steury v. Cardinal Health, Inc., 625 F.3d 262, 268 (5th Cir. 2010) ("The FCA is not a general enforcement device for federal statutes, regulations, and contracts.  Not every breach of a federal contract is an FCA problem." (internal quotation marks and citations omitted)).

## 2.   31 U.S.C. § 3729(a)(1)(B)

Section 3729(a)(1)(B) of the FCA creates a cause of action against anyone who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."  It is not enough to allege that records or statements at issue were made in violation of federal law; a relator must allege that the statements were actually false. Rost II, 507 F.3d at 733.

Goulden contends that BAE violated § 3729(a)(1)(B) by creating "false" reports of the results of its testing of

thermal weapon sights.  The reports were false, under his theory, because they represented that testing was performed using certain kinds of machine guns when in reality it was not. That claim fails for the same reason as the presentment claim: Goulden has not stated a plausible claim that BAE was required to conduct testing as he claims or that any report resulting from its testing would be knowingly false.

### 3.   31 U.S.C. § 3729(a)(1)(C)

Section 3729(a)(1)(C) of the FCA creates a cause of action, in relevant part, against any person who conspires to violate sub-sections (A) or (B).  Goulden asserts in his complaint that BAE conspired with Ohio Ordnance to engage in an illegal "Assisted Manufacture Scheme" through which Ohio Ordnance would "refurbish" machine guns for use in testing.

As an initial matter, it is unclear whether case law with respect to the former FCA conspiracy provision, § 3729(a)(3), remains viable following the amendments to § 3729 based upon the Fraud Enforcement Recovery Act of 2009.  Former § 3729(a)(3) created a cause of action against a person who specifically "conspires to defraud the Government by getting a false or fraudulent claim allowed or paid" whereas revised § 3729(a)(1)(C) creates a cause of action for conspiring to violate several substantive provisions of the FCA.  The parties

both rely upon case law that pre-dates that amendment which strikes the Court as problematic.

In any event, it is clear from the case law that a relator is required to plead a § 3729(a)(1)(C) conspiracy with the particularity required by Fed. R. Civ. P. 9(b). Gagne, 565 F.3d at 45. Moreover, with respect to former § 3729(a)(3), the First Circuit explained that, while there was no need to show that the defendant actually presented a false claim to the government, the relator must show that the defendant intended to defraud the government and agreed that a false statement or record would be material to the decision by the government to pay its claim. Id. at 46 (citing Allison Engine Co. v. U.S. ex rel. Sanders, 553 U.S. 662, 672-73 (2008)).

Regardless of whether all or part of that test remains viable, Goulden has not alleged any facts that would plausibly suggest that Ohio Ordnance knew the terms of the subject contracts or agreed to refurbish weapons in part because it knew that it would be material to payments by the government to BAE. Absent such factual underpinnings, Goulden's claim of conspiracy under § 3729(a)(1)(C) falls short of the particularity required by Fed. R. Civ. P. 9(b).

### 4. 31 U.S.C. § 3730(h)

The anti-retaliation provisions of the FCA entitle an employee, contractor or agent to relief if he or she is

-18-

> discharged, demoted, suspended, threatened, harassed,
> or in any other manner discriminated against in the
> terms and conditions of employment because of lawful
> acts done by the employee, contractor, agent or
> associated others in furtherance of an action under
> [§ 3730] or other efforts to stop 1 or more violations
> of [the FCA].

31 U.S.C. § 3730(h)(1). To establish a prima facie claim for retaliatory termination under the FCA, therefore, a plaintiff must show that 1) he engaged in "protected conduct", 2) the employer knew that the employee was engaged in such conduct and 3) the employee was discharged "because of" that protected conduct. Karvelas, 360 F.3d at 235.

"Protected conduct" in the context of the anti-retaliation provision is to be interpreted broadly to mean

> activities that reasonably could lead to an FCA suit
> [such as] investigations, inquiries, testimonies or
> other activities that concern the employer's knowing
> submission of false or fraudulent claims for payment
> to the government.

Id. at 237. A plaintiff, however, need not have known that his actions could lead to a qui tam suit under the FCA, or even that a claim pursuant to the FCA existed, in order to demonstrate that he engaged in protected conduct. Id.

Here, Goulden has failed to allege sufficient facts to support the conclusion that he was engaged in protected conduct as defined by the First Circuit. Both amended versions of his Complaint state that Goulden reported his concerns that BAE was illegally manufacturing machineguns in violation of federal ATF

-19-

regulations.  See Amended Complaint ¶¶ 81-89; Proposed Second Amended Complaint ¶¶ 119-127.  At no point does he plead that he raised with his employer the issue of non-compliance with the subject contracts or false claims submitted pursuant to those contracts.  As such, he fails to allege that he was engaged in "activities that concern the employer's knowing submission of false or fraudulent claims to the government." Karvelas, 360 F.3d at 237 ("Although correcting regulatory problems may be a laudable goal, it is not actionable under the FCA in the absence of actual fraudulent conduct." (internal citations and quotation marks omitted)).

### C.  State Law Wrongful Discharge Claims (Counts V - VII)

#### 1.  Wrongful Termination in Violation of Public Policy

Relator also asserts a claim of wrongful termination in violation of public policy.  A federal court sitting in diversity must apply the choice of law rules of the state in which it sits and, here, Massachusetts choice of law rules dictate that New Hampshire law applies. See Krause v. UPS Supply Chain Solutions, Inc., No. 08-10237, 2009 WL 3578601, at *5 (D. Mass. Oct. 28, 2009) (applying Massachusetts choice of law rules and finding that Massachusetts law applied to retaliation claims when the retaliatory conduct occurred in Massachusetts).

To prevail on a claim for wrongful termination in violation of public policy under New Hampshire law, a plaintiff must establish 1) that his termination was "motivated by bad faith, retaliation or malice" and 2) that he was terminated for "performing an act that public policy would encourage or for refusing to do something that public policy would condemn." Melvin v. NextEra Energy Seabrook, LLC, No. 09-249, 2010 WL 99095, at *2 (quoting MacKenzie v. Linehan, 969 A.2d 385, 388 (N.H. 2009)). Whether a public policy exists is a question of fact for the jury unless the presence or absence of a policy is so clear that it may be determined as a matter of law. Short v. Sch. Admin. Unit No. 16, 612 A.2d 364, 370 (N.H. 1992).

Here, the work of Goulden's testing group was outsourced and his position terminated a little over one year after he first expressed concern to other employees of BAE that the company had engaged in the illegal manufacture of firearms. At this stage of the litigation, the Court cannot resolve, as a matter of law, whether Goulden's investigation of violations of federal firearm laws and ATF regulations was conducted in furtherance of a cognizable public policy. As a result, the motion to dismiss the claim of wrongful discharge in violation of public policy will be denied.

### 2. Wrongful Termination in Violation of the New Hampshire Whistleblowers' Protection Statute

The New Hampshire whistleblowers' protection statute, N.H. Rev. Stat. Ann. 275-E:2 ("RSA 275-E:2"), provides, in relevant part, that no employer shall discharge any employee because

> [t]he employee, in good faith, reports or causes to be reported, verbally or in writing, what the employee has reasonable cause to believe is a violation of any law or rule adopted under the laws of this state, a political subdivision of this state, or the United States ....

To make out a prima facie case for retaliatory discharge under RSA 275-E:2, a plaintiff must establish that

> 1) he engaged in an act protected by the whistleblowers' protection statute; 2) he suffered an employment action proscribed by the whistleblowers' protection statute; and 3) there was a causal connection between the protected act and the proscribed employment action.

In re Seacoast Fire Equip. Co., 777 A.2d 869, 872 (N.H. 2001) (formally adopting the McDonnell Douglas burden-shifting framework for claims arising under RSA 275-E:2).

Here, Goulden alleges that he was terminated after reporting to Gatto, Grimolizzi and other employees of BAE on several occasions that he believed that BAE was violating federal firearms laws and ATF regulations. Accepting, for the purpose of the motion to dismiss, that his belief was reasonable, his allegations suffice to make out a prima facie case under RSA 275-E:2 because 1) his act of reporting what he

reasonably believed was a violation of federal law is protected
by the statute, 2) he was terminated and 3) the circumstances
give rise to the inference of a causal connection between his
complaints and his termination.

BAE asserts that Goulden lacks standing to bring a
whistleblower claim because, to qualify for protection under RSA
275-E:2, he must first bring an alleged violation to the
attention of a supervisor and allow the employer a reasonable
amount of time to cure the violation.  It provides no legal
authority for that requirement, however, and the Court therefore
disregards whether BAE corrected any violations in its analysis.

### 3.    Wrongful Termination in Violation of M.G.L. ch. 149, § 185

Count VII of the Amended Complaint asserts a claim for
wrongful termination in violation of Massachusetts General Laws
Chapter 149, § 185.  BAE notes, correctly, that the subject law
applies only to public employers. M.G.L. ch. 149, § 185(a)(2).
Goulden does not address that argument but his Proposed Second
Amended Complaint omits Count VII.  In any event, the claim
under M.G.L. ch. 149, § 185 will be dismissed.

### D.    Claims Against BAE Systems, Inc.

Finally, defendants move to dismiss the claim against BAE
Systems, Inc., the parent corporation of which BAE is a
subsidiary, on the grounds that the Complaint makes out no claim

of wrongdoing against BAE.  The Court agrees that the conclusory statements in the Amended Complaints fall far short of what would be required to pierce the corporate veil and hold BAE Systems, Inc., liable under the False Claims Act for the conduct of its subsidiary.  In any event, because BAE Systems, Inc. is not named in any of the claims for wrongful discharge and only those claims will survive the motion to dismiss, all claims against BAE Systems, Inc. will be dismissed.

### E.    Futility of Amendment

As explained *supra*, amendment of Goulden's allegations relating to the FCA would be futile because the new facts raised in the Proposed Second Amended Complaint do not state a claim under the FCA.  The new factual allegations may be relevant to the remaining wrongful discharge claims by, for instance, offering support for the assertion that Goulden reasonably believed that BAE was violating federal law in connection with its testing of thermal weapon sights.  Thus, to the extent that relator believes that the new allegations are relevant to the remaining claims, he will be permitted to include those factual allegations in a Second Amended Complaint that omits the dismissed counts.

<u>**ORDER**</u>

For the foregoing reasons,

1)    defendants' Motion to Dismiss for Failure to State a
      Claim (Docket No. 29) is, with respect to Counts I,
      II, III, IV and VII, **ALLOWED**, but is, with respect to
      Counts V and VI, **DENIED**, and

2)    relator's Motion for Leave to File a Verified Second
      Amended Qui Tam Complaint (Docket No. 41) is, to the
      extent that relator seeks to supplement his pleadings
      under Counts V and VI of the Amended Complaint,
      **ALLOWED**, but is otherwise **DENIED**.

**So ordered.**

                              /s/ Nathaniel M. Gorton
                              Nathaniel M. Gorton
                              United States District Judge
Dated August 7, 2014